UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

John E. Peet,

        Plaintiff,

v.

Sue Morfit; Mark Jones, Manager New
Orleans Court Apt. LLC; Mark Z. Jones,
Highland Management Gr. Inc.; Mark Jones,
Highland Management Group Inc.; Debbie
Goettel, Mayor of Richfield now
Commissioner Hennepin County; Michelle
Luna, City of Richfield HRA (Sec 8 CD
Tec),

        Defendants.

File No. 17-cv-1870 (ECT/TNL)

**OPINION AND ORDER**

John E. Peet, *pro se*.

Eugene C. Shermoen, Jr. and Kari Marie Dahlin, Arthur, Chapman, Kettering, Smetak &
Pikala, PA, Minneapolis, MN, for Defendants Sue Morfitt and Mark Jones.

Jana M. O'Leary Sullivan, League of Minnesota Cities, St. Paul, MN, for Defendants
Debbie Goettel and Michelle Luna.

       This case began in 2017 with Plaintiff John E. Peet alleging that a number of

individuals violated the Fair Housing Act—specifically 42 U.S.C. §§ 3604 and 3617—as

well as two other federal anti-discrimination statutes, 42 U.S.C. §§ 1981 and 1982.  After

extensive motion practice, the dismissal of multiple defendants, and the dismissal of

multiple claims against other defendants, only two claims remain: Peet's § 1982 claim for

injunctive relief against the former Richfield, Minnesota Mayor, Debbie Goettel, and a

former Richfield Housing and Redevelopment Authority employee, Michelle Luna (the "City Defendants"), and his § 1982 claim against New Orleans Court Community Manager Sue Morfitt and the Chief Manager of Highland Management Group, Mark Jones[1] (the "New Orleans Court Defendants"). Both the City Defendants and the New Orleans Court Defendants have filed motions for summary judgment.[2] Both motions will be granted.

---

[1]     The amended complaint incorrectly spells Morfitt's name. *Compare* Am. Compl. [ECF No. 23], *with* Morfitt Decl. [ECF No. 188]. The amended complaint lists "Mark Jones[,] Manager New Orleans Court Apt LLC," "Mark Jones[,] Highland Management Group Inc.," and "Mark Z. Jones[,] Highland Management Gr. Inc." as defendants  Am. Compl. at 1, 3; Civil Cover Sheet [ECF No. 23-2]. In the New Orleans Court Defendants' memorandum in support of their motion for summary judgment, they state that "Defendant Mark Jones is the Chief Manager of Highland" Management Group, Inc., and that Highland Management Group operates the New Orleans Court apartment complex. Mem. in Supp. at 2 [ECF No. 187].   Without any evidence to the contrary, then, it appears that "Mark Jones[,] Manager New Orleans Court Apt LLC" and "Mark Jones[,] Highland Management Group Inc.," are the same person. Further, there is no evidence that "Mark Z. Jones" is a different person, nor are there any allegations that differentiate Mark Z. Jones from Mark Jones. Therefore, the New Orleans Court Defendants' motion for summary judgment will be viewed as a motion for summary judgment on all claims against all three Mark Joneses.

[2]     Both the New Orleans Court Defendants and the City Defendants filed their motions on January 10, 2020. ECF Nos. 177, 185. Peet's brief in opposition was therefore due January 31, 2020. LR 7.1(c)(2); Fed. R. Civ. P. 6. However, Peet did not file his opposition until March 19, 2020. ECF No. 216. Local Rule 7.1(g) permits a court in this district to "take any . . . action that the court considers appropriate" when a party "fails to timely file and serve a memorandum of law." LR 7.1(g). Here, the appropriate course of action is to disregard the arguments made in Peet's untimely memorandum in opposition. Peet has offered no justification for his failure to meet this deadline. Though Peet's arguments in his opposition will not be considered, two points deserve mention. First, Peet has submitted no additional or different materials in opposition to the motions than were submitted already by Defendants. Second, the decision not to consider Peet's arguments does not alone warrant granting Defendants' summary-judgment motions. The motions will be considered on their merits. *See Carter v. Hiesterman*, No. 17-cv-1061 (DWF/ECW), 2019 WL 7650425, at *4 (D. Minn. Oct. 21, 2019), *report and recommendation adopted*, 2020 WL 375668 (D. Minn. Jan. 23, 2020) ("A failure to respond to a motion for summary judgment does not compel an automatic grant of summary judgment in favor of the movant. Rather, Rule 56(e) provides that, if a party fails to respond or address another party's

I

From January 15, 2011, to February 2, 2013, Peet, a Black man, lived at the New Orleans Court apartment complex in Richfield, Minnesota.  Dahlin Decl., Ex. 5 [ECF No. 191-1 at 2]; Dahlin Decl., Ex. 31 [ECF No. 191-2 at 41]; McDonald Decl. ¶15 [ECF No. 189].  Peet's time at New Orleans Court was fraught with conflict.   In the spring of 2011, shortly after Peet moved in, some of Peet's neighbors complained to Morfitt that Peet was repairing cars in the parking lot, in violation of New Orleans Court's community rules.  Morfitt Decl. ¶ 9 [ECF No. 188]; Dahlin Decl., Ex. 5 [ECF No. 191-1 at 17].  Morfitt sent a courtesy letter to Peet, reminding him that car repairs were not permitted in the parking lot.  Morfitt Decl. ¶ 10–11; Dahlin Decl., Ex. 7 [ECF No. 191-1 at 22].  Later that year, after Peet complained that other tenants were repairing their cars in the parking lot, Morfitt sent a letter to the whole New Orleans Court community, reiterating that car repairs were not permitted in the parking lot.  Dahlin Decl., Ex. 9 [ECF No. 191-1 at 23].

Another conflict surrounded Peet's complaints of cold air coming into his apartment through his patio door and windows.  Morfitt Decl. ¶ 14; Dahlin Decl., Ex. 12 [ECF No. 191-1 at 26].  Morfitt attempted to address these concerns, and a New Orleans Court maintenance technician, Roderick Victrum, placed insulation on Peet's patio door to attempt to stop any cold air inflow in early 2012.  Victrum Decl. ¶¶ 1, 5 [ECF No. 190]; Dahlin Decl., Ex. 12.  Peet continued to complain about cold air coming into his apartment,

---

assertion, the court shall grant summary judgment only if the motion and supporting materials warrant that outcome.") (citing *United States v. One Parcel of Real Prop.*, 27 F.3d 327, 329 n.1 (8th Cir. 1994); Fed. R. Civ. P. 56(e)(3)).

but anytime Morfitt or Victrum entered his apartment to inspect the patio door, the temperature was always in the 70s and there were no visible issues with the door.  Morfitt Decl. ¶¶ 15–17; Victrum Decl. ¶ 6.  Because of Peet's continued complaints about his door and windows, Morfitt arranged for a carpenter to come to Peet's unit to inspect the door.  Morfitt Decl. ¶ 18–19.  The carpenter had been scheduled to arrive in the morning, but due to an emergency service call, he was delayed by a few hours.  *Id.* ¶ 21.  Unaware of the emergency service call, Peet went to the assistant property manager's office and was very upset that the carpenter had not arrived.  *Id.* ¶ 22; Victrum Decl. ¶ 9.  Peet was yelling and pounding his fist on the table in the assistant manager's office, and was so upset that Victrum, who was in the office, "decided to stay in the area to make sure Mr. Peet did not physically harm the assistant manager."  Victrum Decl. ¶ 9.  When the carpenter finally arrived, a woman in Peet's apartment denied him entry to the unit.  *Id.* ¶ 10.  Based on this incident, Morfitt issued Peet a lease violation because his "behavior in the office, and [his] refusal to let the carpenter in to [his] home [was] in violation of" his lease.  Dahlin Decl., Ex. 13 [ECF No. 191-1 at 27–28].

Similar events transpired when Morfitt attempted to address Peet's concerns with his windows.  From early 2011, Peet had complained to Morfitt that his windows appeared old and needed to be replaced.  Morfitt Decl. ¶ 24.  Morfitt informed him that the windows were scheduled for replacement that year.  *Id.*  However, due to unexpected roof replacements on other buildings in the New Orleans Court apartment complex, his window replacement was postponed.  *Id.*  In a January 2012 letter explaining the delay to Peet, Morfitt also informed Peet that she had spoken with Defendant Luna, who informed Morfitt

that the windows met all HUD requirements.  Dahlin Decl., Ex. 15 [ECF No. 191-1 at 30–31].  Morfitt told Peet that she anticipated new windows would be installed in his building in 2012.  *Id.*  Unsatisfied with this, Peet "demanded that a public safety inspector look at the windows."  Morfitt Decl. ¶ 26.  On January 26, 2012, a Richfield City inspector came to look at Peet's windows, accompanied by Morfitt and Victrum.  Morfitt Decl. ¶ 27; Victrum Decl. ¶ 15.  The inspector examined the windows and patio door in Peet's apartment, and informed Peet that they were in acceptable condition and met HUD standards.  Morfitt Decl. ¶ 28; Victrum Decl. ¶¶ 16–17.  Peet apparently would not accept this; he became loud and aggressive and cursed at the inspector.  Morfitt Decl. ¶¶ 28–30; Victrum Decl. ¶¶ 16–20.  Due in part to his continued complaints regarding his door and windows, Morfitt sent Peet a letter offering him a mutual termination of his lease, which would not impact his rental history in a negative way.  Morfitt Decl. ¶ 32; Dahlin Decl., Ex. 17 [ECF No. 191-1 at 33].  Peet did not respond to the mutual termination offer.  Morfitt Decl. ¶ 32.  A few months later, Peet's windows were replaced.  Morfitt Decl. ¶ 31.

A much more significant conflict began around November 2011, when New Orleans Court management began receiving complaints about Peet from GZ, a White man who lived in an apartment on the floor above Peet.  Morfitt Decl. ¶ 33.  Around the same time, Peet began complaining that GZ was harassing him.  Morfitt Decl. ¶ 34; Dahlin Decl., Ex. 1 at 46–48, 65, 68 [ECF No. 193-1].  Peet testified in his deposition that he never did anything to harass or disturb GZ, but rather that the conflict was entirely one-sided.  *See* Dahlin Decl., Ex. 1 at 48, 51, 122.  Peet asserts that he complained to Morfitt, "corporate," the Richfield Police Department, Defendant Luna, and Defendant Goettel, among others,

asking "everybody to stop [GZ] from harassing [him] and trying to stalk [him] everyday."
Dahlin Decl., Ex. 1 at 47. Both Peet and GZ claimed that Morfitt was not addressing their
complaints about the other. Morfitt Decl. ¶ 34; Dahlin Decl., Ex. 1 at 65; Dahlin Decl.,
Ex. 26 [ECF No. 191-2 at 30]. Due to their ongoing and escalating conflict, both GZ and
Peet were advised by Morfitt to contact the police if they felt threatened or harassed by the
other, and both were offered the opportunity to move apartments. Dahlin Decl., Ex. 24
[ECF No. 191-1 at 34–35]; Dahlin Decl., Exs. 19, 21 [ECF Nos. 191-2 at 14, 16]; Morfitt
Decl. ¶¶ 37, 40–41. Both Peet and GZ declined the option to move. Morfitt Decl. ¶ 40–
41.

The conflict between GZ and Peet continued and reached a boiling point in August
and September 2012. By that time, Morfitt did not take any action regarding Peet's
complaints without first consulting her supervisor, Shari McDonald, the Regional Property
Manager for Highland Management Group. Morfitt Decl. ¶ 46; McDonald Decl. ¶¶ 1, 6.
Peet had lodged numerous complaints about GZ and other tenants in the New Orleans
Court complex, *see* Morfitt Decl. ¶ 44–45; Dahlin Decl., Ex. 24, and Morfitt replied to at
least some of these complaints in a September 5, 2012 letter, telling Peet either that his
complaints were unsubstantiated or that the complained-of conduct was not a lease
violation, Dahlin Decl., Ex. 24. In this letter, Morfitt reiterated that the offer to mutually
terminate his lease still stood, but again Peet did not accept. *Id.*; Morfitt Decl. ¶ 45. On
September 6, 2012, McDonald decided not to renew Peet's lease when it expired the
following January. McDonald Decl. ¶ 7. Peet was not informed of this decision at that
time. *Id.*

On September 10, GZ came to Morfitt's office and reported to her that Peet had approached him in a very threatening manner, and that GZ was afraid to go home because Peet was in front of their building making racial slurs. Morfitt Decl. ¶ 48. Because she had witnessed Peet's "ability to become angry," Morfitt called Victrum to ask for his assistance in walking GZ home and potentially diffusing the situation. *Id.* ¶ 49. As Morfitt, Victrum, and GZ approached the building, Peet shouted at GZ, calling him a "big f-ing baby" because he "ha[d] to get the manager to walk [him] home." *Id.* at 50. Peet took out a camera and began photographing the three, and Morfitt felt threatened by Peet's behavior. *Id.* Based on Peet's behavior, Morfitt issued Peet a lease violation on September 12, 2012. Morfitt Decl. ¶ 54; Dahlin Decl., Ex. 28 [ECF No. 191-1 at 36].

Also on September 10, a female tenant came to Morfitt and reported that Peet had been sexually harassing her for the past year. Morfitt Decl. ¶ 56. The tenant said she was afraid to report the harassment because Peet was aggressive and intimidating, and she feared Peet would hurt her if she reported the harassment. *Id.* On September 12, New Orleans Court received copies of a petition for a restraining order the female tenant had filed against Peet. McDonald Decl. ¶ 10; Dahlin Decl., Ex. 30 [ECF No. 191-2 at 34]. The petition indicated that Peet had been physically and verbally harassing the female tenant. Dahlin Decl., Ex. 30. The petition was granted. *Id.* Peet testified in his deposition that the female tenant's allegations were fabricated, and that Morfitt conspired with the tenant to levy the complaint against Peet as justification for not renewing Peet's lease. Dahlin Decl., Ex. 1 at 89–91.

7

Around the same time McDonald received the petition and restraining order, she received a letter from Peet titled "Unfair Housing Complaint," which leveled accusations that Morfitt's September 5 letter was a lie, that Peet was being racially profiled, and that Morfitt was allowing GZ to harass Peet because GZ was white.  McDonald Decl. ¶ 8; Dahlin Decl., Ex. 25 [ECF No. 191-2 at 20].  The letter asserted that "[i]f [GZ] was Black and [Peet] was White [McDonald], and Hud + Police Dept would have been stop [sic] this with all the police call[s] that you have call[ed] yourself and staff."  Dahlin Decl., Ex. 25 at 8.  The letter also asserted that Morfitt "violat[ed] [Peet's] rights to privacy by g[iving GZ his] last name and [telling him Peet is] on housing [assistance] and SSI[.]"  *Id.* at 9.

Based on the female tenant's restraining order against Peet, Peet's threatening behavior, and McDonald's concern that "any action taken regarding [Peet's] tenancy would result in [Peet] filing a discrimination complaint," McDonald consulted outside counsel regarding how to proceed.  McDonald Decl. ¶ 11.  On September 20, outside counsel wrote Peet a letter informing him that his lease would expire on January 31, 2013, and would not be renewed.  Dahlin Decl., Ex. 31.  The letter yet again offered Peet the opportunity for a mutual termination of his lease, which Peet again did not accept.  *Id.* at 1.  The letter cited as reasons for the non-renewal the restraining order against Peet, the "history of complaints and frictions between [Peet] and [GZ] . . . [and] incidents and communications, witnessed by Management, where [Peet was] inappropriately demanding, confrontational and verbally aggressive."  *Id.* at 1–2.

On September 26, Peet obtained a restraining order against GZ, based on his averments that GZ had been harassing him.  Dahlin Decl., Ex. 32 [ECF No. 191-2 at 45].

McDonald forwarded this petition and order to outside counsel, who recommended issuing a notice of non-renewal to GZ.  McDonald Decl. ¶ 12–13.  On October 1, outside counsel sent a letter to GZ informing him that his lease would not be renewed and offering him an opportunity to mutually terminate his lease at New Orleans Court.  Dahlin Decl., Ex. 33 [ECF No. 191-2 at 53].  On November 8, Peet obtained a restraining order against Morfitt, based on his averments that she had been sending him letters threatening to evict him if Morfitt received more complaints about him from other tenants.  *Id.*, Ex. 34 [ECF No. 191-2 at 55].  On November 26, Peet filed a charge of discrimination with the Minnesota Department of Human Rights against Highland Management Group.  Dahlin Decl., Ex. 53 [ECF No. 191-1 at 54–55].  The charge was dismissed based on the Department's determination that no probable cause existed to support the charge.  *Id.*, Ex. 54 [ECF No. 191-1 at 56–59].  Peet appealed the decision, and the decision was affirmed.  *Id.*, Ex. 57 [ECF No. 191-1 at 60–63].  Peet also filed a Housing Discrimination Complaint with the U.S. Department of Housing and Urban Development's Region V Office of Fair Housing and Equal Opportunity, which was also dismissed based on a determination of no reasonable cause.  Dahlin Decl., Exs. 49, 51 [ECF No. 191-1 at 50–53]; Dahlin Decl., Ex. 50 [ECF No. 191-2 at 75].

After moving out in February 2013, Peet frequently returned to the New Orleans Court complex.  He occasionally drove past Morfitt, only to speed up when she noticed him.  Morfitt Decl. ¶ 64.  New Orleans Court management received complaints from tenants that Peet was on the property asking them to sign something or help him with his Minnesota Department of Human Rights unfair housing charge.  *Id.* ¶ 65; Dahlin Decl.,

Ex. 44 [ECF No. 191-2 at 74].  In June 2014, nearly a year and a half after moving out,

Morfitt witnessed Peet standing by the New Orleans Court property sign, yelling that New

Orleans Court was a bad place to rent.  Morfitt Decl. ¶ 67.  Morfitt informed McDonald of

this, and McDonald advised Morfitt to contact outside counsel to obtain a no-trespass

notice.  McDonald Decl. ¶ 17.  Morfitt did so, and on June 9, 2014, outside counsel drafted

a trespass advisory notice to Peet, informing him that he "no longer ha[d] any permission,

given or implied, to enter" the New Orleans Court property.  Dahlin Decl., Ex. 45 [ECF

No. 191-1 at 45–46].

From 2013 to early 2015, Peet lived at Buena Vista Apartments in Richfield.  Dahlin

Decl., Ex. 1 at 10.  Peet testified in his deposition that he left Buena Vista because "New

Orleans Court sent Buena Vista [the] no trespassing letter . . . and it started a conflict with

[Buena Vista] management."  *Id.* at 11.  He continued that "New Orleans Court and Buena

Vista started having conversations," and that the Buena Vista manager told him that Morfitt

told Buena Vista that Peet was "a problem tenant and [he] was aggressive and angry and

just a problem tenant."  *Id.* at 11, 105–06.  Peet cancelled his lease with Buena Vista on

January 31, 2015, and the evidence indicates he moved out after giving proper notice.  *See*

Dahlin Decl., Ex. 46 [ECF No. 191-1 at 47].  After Peet moved out of Buena Vista, Morfitt

provided a rental verification form for an apartment complex Peet was interested in moving

into.  *Id.*, Ex. 48 [ECF No. 191-1 at 49].  In that form, Morfitt indicated that Peet was asked

to vacate New Orleans Court.  *Id.*  Peet's rental application was apparently denied.  *Id.*, Ex.

1 at 115–16.  After leaving Buena Vista, Peet was homeless until about September 2015.

*Id.* at 10.  During this period of homelessness, Peet seems to have applied or inquired about

housing at a number of apartment complexes.  *Id.* at 108–16.  Peet testified that his applications or inquiries were denied because he could not get a housing reference.  *Id.* at 108.  According to Peet, Morfitt and Luna told the landlords of those housing complexes that Peet was "a bad tenant, violent, aggressive and angry," and that if the landlords wanted evidence of this, they could inquire with the Richfield Police Department.  *Id.* at 108–12.  Peet testified that at least some of those landlords told him that Morfitt told them that Peet was a bad tenant.  *Id.* at 108–16.  In September 2015, Peet moved into an apartment complex in Prior Lake, Minnesota, but has since moved to a different complex in Prior Lake.  *Id.* at 8–10.

On June 2, 2017, Peet filed this lawsuit against the New Orleans Court Defendants, the City Defendants, and a number of other individuals.  After three motions to dismiss were granted or granted in part, the only remaining claims are Peet's § 1982 claim for injunctive relief against the City Defendants and his § 1982 claim against the New Orleans Court Defendants.  As for his claim against the New Orleans Court Defendants, Peet asserts that racial animus or discriminatory intent played a role in their decision not to renew his lease.  He seeks damages to compensate him for the homelessness he suffered after leaving New Orleans Court, emotional injuries, and reputational injuries.  Am. Compl. at 11, ¶ 2.  His claim against the City Defendants is not quite so clear, but it appears he alleges they violated § 1982 by failing to adequately investigate or address his complaints about GZ, failing to intervene to stop GZ from harassing him, and placing or maintaining certain documents in his Housing and Redevelopment Authority file and Richfield Police record.  From the City Defendants, Peet seeks injunctive relief in the form of the removal of

documents from his housing record and police record, including documents relating to complaints against him by New Orleans Court tenants, complaints against him by New Orleans Court itself, the sexual harassment and assault complaint against him, and the petitions and orders for restraining orders involving Peet as either the petitioner or respondent. *See id.*; Report and Recommendation at 4 [ECF No. 74].

## II

Defendants' motions are analyzed with the familiar summary judgment standards in mind. Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.* at 255. Though the record is viewed "in the light most favorable to [Peet] as the non-moving party, . . . this favorable presumption [is not stretched] so far as to consider as evidence statements found only in inadmissible hearsay." *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001). Nor can conclusory statements in depositions or affidavits suffice to withstand summary judgment. *See, e.g.*, *Heisler v. Metro. Council*, 339 F.3d 622, 628 (8th Cir. 2003); *Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 686 (8th Cir. 2003); *Berg v. Bruce*, 112 F.3d 322, 327–28 (8th Cir. 1997).

12

Section 1982 provides that "[a]ll citizens of the United States shall have the same right . . . to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982.  This section "protect[s] citizens' rights to . . . [lease] both personal and real property without any impairment due to private or public racial discrimination." *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004).  There are two ways to establish a § 1982 claim.  First, "the prima facie elements of a § 1982 case . . . require that a plaintiff show (1) membership in a protected class; (2) discriminatory intent on the part of the defendant and (3) interference with the rights or benefits connected with the ownership of property."  *Id.*  Second, "§ 1982 encompasses retaliation claims." *CBOCSWest, Inc. v. Humphries*, 553 U.S. 442, 447 (2008) (discussing *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 (1969), *abrogated on other grounds by Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017)).  Though the Eighth Circuit has not defined the elements of a § 1982 retaliation claim, the Supreme Court "has construed §§ 1981 and 1982 alike because it has recognized the sister statutes' common language, origin, and purposes." *CBOCS West*, 553 U.S. at 448.  It makes sense, then, to use the elements of a § 1981 retaliation claim when faced with a retaliation claim under § 1982.  *See Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, 861 F. Supp. 2d 470, 483 (M.D. Pa. 2012) (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 105 (2d Cir. 2001)) (applying the Second Circuit's § 1981 retaliation elements to a § 1982 claim).  The prima facie elements of a § 1981 retaliation claim are "(1) that [the plaintiff] engaged in statutorily protected activity; (2) an adverse [] action was taken against him[]; and (3) a causal connection exists between the two events." *Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1030–31 (8th Cir. 2013) (third alteration in original).  Though

these elements are broad and would seem to apply to retaliation based on any type of protected activity, courts have held that "to be actionable under § 1981," and presumably, given their similar history and purpose, § 1982, "the retaliation must have been in response to the claimant's assertion of rights that were protected by § 1981" or § 1982. *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998); *see also, e.g.*, *Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 290 (S.D.N.Y. 2005) ("Because § 1981 is concerned only with discrimination on the basis of race, its implicit prohibition of retaliation against those who complain of discrimination is similarly limited to complaints of *racial* discrimination."); *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 176 (2005) (stating that § 1982, "a general prohibition on racial discrimination[,] [] cover[s] retaliation against those who advocate the rights of groups protected by that prohibition"). Thus, a successful § 1982 retaliation claim is established only if the plaintiff was retaliated against for advocating their § 1982 rights.

A violation of § 1982 can be established by direct or indirect evidence. *See Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1452 (4th Cir. 1990). Because "direct proof of unlawful discrimination is often difficult to obtain," *id.*, "[t]he three-part burden of proof analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a Title VII employment discrimination case, has been widely applied to . . . § 1982 claims" *Asbury v. Brougham*, 866 F.2d 1276, 1279 (10th Cir. 1989); *see Dirden v. Dep't of Hous. & Urban Dev.*, 86 F.3d 112, 114 (8th Cir. 1996) (applying *McDonnel Douglas* framework to § 1982 claim). The *McDonnell Douglas* framework is applicable only where the plaintiff cannot or does not present direct evidence

of discrimination. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). Under that framework, "the plaintiff has the initial burden of proving a prima facie case. The burden of production then shifts to the [defendant] to articulate some legitimate, nondiscriminatory reason for the [interference with property rights]. The [plaintiff] must then rebut the [defendant's] reason by proving that [the] articulated reason was mere pretext." *Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 726–27 (8th Cir. 1992) (internal quotation marks and citations omitted).

## A

The New Orleans Court Defendants' summary judgment motion will be granted. The problem with Peet's claims at this stage is simple: he has provided no evidence of any discrimination, let alone racial discrimination. The evidence that Peet says supports his claims against the New Orleans Court Defendants amounts to unsupported allegations that his white neighbor, GZ, was treated better than he was, that other tenants who violated their leases by performing car repairs in the parking lot were treated better than Peet, that an unidentified other tenant who was allegedly accused of sexual assault was treated better than Peet, and that the New Orleans Court Defendants conspired with Peet's neighbors by encouraging them to file fabricated complaints against Peet in order to justify not renewing Peet's lease. These conclusory allegations cannot withstand summary judgment.

### 1

Direct evidence of racial discrimination in this context would be evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion

actually motivated" New Orleans Court's decision not to renew Peet's lease. *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997) (citation, quotation marks, and alteration omitted). Here, there is simply no direct evidence of discriminatory animus on the part of the New Orleans Court Defendants. In his deposition, Peet acknowledged that he never witnessed Morfitt or Jones utter any racial slurs. Dahlin Decl., Ex. 1 at 19. Though there is some evidence that Morfitt wanted to "get rid of" Peet, *see* Dahlin Decl., Ex. 1 at 10, 22, this is not direct evidence of racial discrimination because there is no suggestion that Morfitt intended or wanted to "get rid" of Peet because of any racial animus or discriminatory intent. There is no evidence in the record, other than Peet's assertions and hearsay, to support Peet's contention that Morfitt met with Peet's female neighbor to concoct the sexual assault accusation against Peet. And again, even if there were such evidence, there is no evidence the plan was hatched due to Peet's race. His bare assertions that the New Orleans Court Defendants treated white tenants better than black tenants by not issuing lease violations to white tenants for activities that would result in lease violations for black tenants, *see, e.g.*, Dahlin Decl., Ex. 1 at 19, are entirely unsupported by the evidence in the record, *see* Morfitt Decl. ¶¶ 8, 10–11, 12, 36, 40–43; Dahlin Decl., Ex. 23 [ECF No. 191-2 at 19]. Peet's assertion that Morfitt told other landlords in Richfield not to rent to Peet because he was "a problem tenant and [he] was aggressive and angry and just a problem tenant," even if supported by evidence in the record, does not show racial animus or discriminatory intent. *See* O'Leary Sullivan Decl., Ex. 1 at 105. In sum, there is no evidence in the record other than Peet's bare assertions that would permit a reasonable fact finder to determine that the New Orleans Court Defendants possessed a

discriminatory animus that played a role in the decision not to renew Peet's lease. *See Kriss v. Sprint Comm'ns Co.*, 58 F.3d 1276, 1282 (8th Cir. 1995) (quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993)) (requiring evidence of "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the factfinder to find that that attitude was more likely than not a motivating factor in the [] decision"). Peet's allegations are not evidence, and they do not show a genuine dispute over this fact. *Bloom v. Metro Heart Grp of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006) ("[Plaintiff]'s speculation and conjecture are insufficient to defeat summary judgment."). Furthermore, the evidence shows that the decision not to renew Peet's lease was made by McDonald, not Morfitt or Jones, Morfitt Decl. ¶ 61; McDonald Decl. ¶ 7, so even if there were direct evidence that Morfitt or Jones possessed a racial animus, that would not be evidence "sufficient to permit the factfinder to find that that attitude was more likely than not a motivating factor in the decision," *Kriss*, 58 F.3d at 1282.

Because there is no direct evidence of discrimination, "the appropriate analysis for this case is the burden-shifting framework the Supreme Court set forth in *McDonnell Douglas*[.]" *Thomas*, 111 F.3d at 66. Peet satisfies the first and third elements of a prima facie § 1982 discrimination claim: he is a member of a protected class and the non-renewal of his lease constitutes interference with his right to lease real property. *See Daniels*, 373 F.3d at 887; 42 U.S.C. § 1982; New Orleans Court Mem. in Supp. at 29 [ECF No. 187]. However, the evidence shows beyond genuine dispute that the New Orleans Court Defendants did not act with discriminatory intent when they decided not to renew his lease,

and Peet therefore cannot make out a prima facie case against the New Orleans Court Defendants. Instead, the evidence shows as a matter of law that Peet's lease was not renewed because he had been the subject of numerous complaints from other tenants, New Orleans Court management had witnessed him being "inappropriately demanding, confrontational and verbally aggressive," and New Orleans Court management was "concerned that [Peet's] anger towards other residents in the rental community, the police, Management and its agents, [was] escalating." Dahlin Decl., Ex. 31; *see* McDonald Decl. ¶ 11.

As with the question whether any direct evidence of discrimination exists, the vast majority of potential indirect evidence comes from Peet's deposition. Peet's primary contention seems to be that the New Orleans Court Defendants treated him differently than his white neighbor, GZ. *See* O'Leary Sullivan Decl., Ex. 1 at 65, 93–94. The evidence undermines this theory. Both Peet and GZ made complaints to Morfitt about each other. *See* Dahlin Decl., Exs. 19, 20, 24. In response to these complaints, Morfitt advised both Peet and GZ to call the police if they felt threatened or harassed. Dahlin Decl., Exs. 19, 24; Morfitt Decl. ¶ 37. Both Peet and GZ were offered the opportunity to move to a different apartment within New Orleans Court. Dahlin Decl., Exs. 21, 24; Morfitt Decl. ¶¶ 40–41. GZ was issued a lease violation and a lease-violation warning relating to the conflict between him and Peet. Dahlin Decl., Exs. 22, 23; Morfitt Decl. ¶¶ 42–43. Both Peet and GZ were offered mutual terminations of their leases at New Orleans Court. Dahlin Decl., Exs. 21, 24; Morfitt Decl. ¶¶ 40, 45. New Orleans Court ultimately did not renew either Peet's or GZ's lease. Dahlin Decl., Ex. 31; McDonald Decl. ¶¶ 11, 13. Because the

evidence shows Peet and GZ were treated similarly, Peet's bare assertion that he was treated worse than GZ does not present a genuine dispute as to whether the New Orleans Court Defendants acted with discriminatory intent. *See Schoffstall v. Henderson*, 223 F.3d 818, 826 (8th Cir. 2000) (affirming summary judgment were plaintiff failed to show that similarly situated individuals were treated differently); *Armstrong v. Sys. Unlimited, Inc.*, 75 F. App'x 550, 551 (8th Cir. 2003) (per curiam) (unpublished) ("The evidence viewed in the light most favorable to [the plaintiff] establishes only that she was treated the same (although perhaps equally badly) as male and female employees with other types of medical conditions.").

Nor is there any evidence Peet was treated differently than other tenants who violated New Orleans Court community rules by working on their cars in the parking lot. In fact, the evidence shows Peet was treated the same or better. When Morfitt learned Peet was performing car repairs in the parking lot, she sent him a letter reminding him that "vehicle repair work is against the Community Rules," and including the relevant portion of the community rules. Dahlin Decl., Ex. 7. On the other hand, when Morfitt learned that two Hispanic tenants were performing car repairs in the parking lot, she sent them a Lease Violation Warning, informing them that if they continued, "it will lead to a lease violation & can put your lease in jeopardy of a non-renewal." *Id.*, Ex. 8. Peet points to a photograph he took of another tenant performing auto-repair work in the parking lot as evidence that Morfitt did nothing to stop other individuals from working on their cars in the parking lot, *id.*, Ex. 61, but there is no indication Morfitt was ever made aware of this incident, nor is

there evidence of when the photograph was taken, nor is there evidence that the individual did not receive a reminder or lease violation or warning.

There is no evidence that Morfitt met with the female tenant who accused Peet of sexually harassing her prior to that tenant informing Morfitt of the alleged harassment. Morfitt testifies that her interactions with the female tenant prior to being informed of the harassment "were limited to routine communications about administrative aspects of her tenancy." Morfitt Decl. ¶ 10. Peet's bare claim that there was an unidentified, unknown witness at secret meetings between Morfitt and the female tenant, Dahlin Decl., Ex. 1 at 91, has no record support. To the extent Peet claims he was treated differently than another individual accused of sexual assault, *see id.* at 203–207, there is no evidence that the other individual was actually accused of sexual assault, there is no evidence Morfitt knew of any accusation against that individual, and there is no evidence that individual was subject to a restraining order due to any sexual assault claims. *See also Mays*, 255 F.3d at 648 (hearsay cannot withstand summary judgment).

Finally, Peet's claims that Morfitt told other landlords in Richfield not to rent to him are also not supported by the evidence. Peet's statements in his deposition that landlords told him that Morfitt told them that Peet was a bad tenant are hearsay, and do not show a genuine dispute. *See id*. Even considering those hearsay statements, they do not create a genuine dispute here because they are not evidence of *racial* animus or discrimination. They show only that Morfitt thought Peet was an aggressive, confrontational, and difficult tenant, which is supported by the many complaints Morfitt received and her personal

20

knowledge of Peet's behavior.  *See, e.g.*, Morfitt Decl. ¶¶ 9, 22, 28–30, 33, 47, 49, 53, 56, 65, 67.

There is no evidence whatsoever that Jones played any role in Peet's tenancy.  Peet testified in his deposition that he had never met Jones, and his claim against Jones seems to stem from his belief that "corporate" at New Orleans Court or Highland Management Group should have stepped in to do something about the dispute between Peet and GZ.  *See* Dahlin Decl., Ex. 1 at 123–124.  This is not evidence of a violation of § 1982.  To the extent Peet argues Jones violated § 1982 by failing to adequately supervise Morfitt, *see id.*, there is no evidence Morfitt violated § 1982, and therefore any failure on Jones' part to supervise Morfitt is not, itself, a violation of § 1982.  *Cf. Sitzes v. City of West Memphis*, 606 F.3d 461, 470 (8th Cir. 2010) (affirming summary judgment on § 1983 failure-to-supervise and failure-to-train claims because they "could not be sustained absent an underlying constitutional violation by the" supervisee).

In sum, Peet's claims that Morfitt and Jones discriminated against him are just that:  Peet's claims.  He has presented no evidence, direct or indirect, that can withstand summary judgment.  *See Mays*, 255 F.3d at 648 (hearsay statements not sufficient to withstand summary judgment); *Heisler*, 339 F.3d at 628 (conclusory deposition statements not sufficient to withstand summary judgment).

2

Peet's § 1982 retaliation claim does not survive either.  The retaliation claim is not very clear, but seems to be premised either (1) on Peet's testimony that Morfitt retaliated against him for complaining to Defendant Luna, Defendant Goettel, the Department of

21

Housing and Urban Development, and the Minnesota Department of Human Rights, among others, about the treatment he was receiving from GZ, or (2) on the evidence that he was notified of McDonald's decision not to renew his lease after he sent his self-styled unfair housing complaint to her.[3]  *See* Dahlin Decl., Ex. 1 at 46–47, 66.

As for the first possible interpretation of the retaliation claim, Peet testified that "once [he] made the complaint to the HUD Department, the tables turned," and Morfitt "started trying to pretend like [he] was harassing [GZ]." *Id.* at 66.  This claim fails because the complaints Peet made were not the types of complaints protected by § 1982.  That is, Peet's complaints to Defendants Luna and Goettel, the Minnesota Department of Human Rights, the Department of Housing and Urban Development, and others were not complaints advocating for his § 1982 rights or complaints of racial discrimination.  *See Jackson*, 544 U.S. at 176 (stating § 1982 "cover[s] retaliation against those who advocate the rights of groups protected by" § 1982).  Rather, Peet was "call[ing] everybody to stop [GZ] from harassing [him] and trying to stalk [him] everyday"—they were complaints of stalking and harassment.  Dahlin Decl., Ex. 1 at 47.

---

[3]    To the extent Peet's retaliation claim is premised on an argument that his lease was not renewed because he filed formal complaints with the Minnesota Department of Human Rights and the Department of Housing and Urban Development, the claim fails because McDonald decided not to renew his lease—and Peet was informed of this decision—prior to the filing of those complaints. *See Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1044 (8th Cir. 2007) ("[A]lleged retaliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event."); McDonald Decl. ¶ 7 ("On September 6, 2012, I decided to non-renew Mr. Peet's lease."); Dahlin Decl., Ex. 53 (Peet's discrimination charge with Minnesota Department of Human Rights filed November 11, 2012); Dahlin Decl., Ex. 49 (Peet's housing discrimination complaint with the Department of Housing and Urban Development filed December 17, 2012).

The second possible interpretation of his retaliation claim fails as well, but for different reasons. Peet drafted an "unfair housing complaint" to McDonald on September 7, 2012, Dahlin Decl., Ex. 25, one day after McDonald decided not to renew Peet's lease, McDonald Decl. ¶ 7. Because the complaint was made after the adverse action was already taken, there is no causal connection between the two. *See Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1044 (8th Cir. 2007) ("[A]lleged retaliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event."). If the decision not to renew Peet's lease wasn't official until the September 20 letter from outside counsel, he still cannot show causation because from September 7 to September 20, Morfitt witnessed Peet harassing GZ, Morfitt Decl. ¶ 48–54, the female tenant reported to Morfitt that Peet had been sexually harassing her during the previous year, *id.* ¶ 56, and the female tenant obtained a restraining order against Peet, *id.* ¶ 58. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) (stating that "[g]enerally, more than a temporal connection between the protected conduct and the adverse [] action is required to present a genuine factual issue on retaliation," and that "intervening unprotected conduct [can] erode[] any causal connection that was suggested by the temporal proximity of [the] protected conduct and" the adverse action).

B

Peet's claims against the City Defendants are difficult to decipher. He appears to allege that they violated § 1982 by failing to adequately investigate his claims that GZ was harassing him, *see* O'Leary Sullivan Decl., Ex. 1 at 47, failing to intervene to stop GZ from harassing him, *see id.* at 189, 192, making inappropriate statements about Peet to other

23

New Orleans Court tenants, *see id.* at 200, and by placing or maintaining records in Peet's housing file relating to complaints made against Peet by other New Orleans Court tenants, *see id.* at 217–18.  Peet seeks injunctive relief against the City Defendants in the form of the removal from his Richfield Housing and Redevelopment housing file and Richfield Police record of some number of documents relating to those complaints against him, because he argues his landlord or future landlords could obtain the housing or police file and use the information contained within them to deny him housing.  *Id.* at 216–18.  The City Defendants' motion will be granted because Peet does not have standing to pursue his claims for injunctive relief.

"[T]he irreducible constitutional minimum of standing contains three elements," (1) injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) likelihood that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "The mere fact that injurious activity took place in the past does nothing to convey standing to seek injunctive relief[.]"  *Harmon v. City of Kansas City*, 197 F.3d 321, 327 (8th Cir. 1999).  Instead, to have standing to seek injunctive relief, that past injury must be accompanied by "continuing, present adverse effects."  *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).  Peet must show that he "is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury [is] both real and immediate, not conjectural or hypothetical."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citations and internal quotation marks omitted).

Peet's contention that the City Defendants failed to adequately investigate his claims that GZ was harassing him, failed to intervene to stop that alleged harassment, and made inappropriate statements about Peet to other New Orleans Court tenants are "only [alleged] past infractions of [§ 1982], and not a continuing violation or the likelihood of a future violation," and therefore, "injunctive relief will not redress [his] injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998). Accordingly, Peet does not have standing to seek injunctive relief relating to those alleged injuries.

Peet's allegation that the City Defendants placed or maintained documents in his housing or police record could constitute an injury accompanied by "continuing, present adverse effects," *O'Shea*, 414 U.S. at 496, but Peet has not shown that the threat of injury due to the presence of those documents is "real and immediate," rather than "conjectural or hypothetical," *Lyons*, 461 U.S. at 102. To begin with, Peet admitted in his deposition that his current landlord "do[esn't] care about" any of the information contained in his housing file or police file. O'Leary Sullivan Decl., Ex. 1 at 218. Therefore, insofar as Peet can be understood to assert that he might be evicted or subject to other adverse treatment at his current home due to the documents in his housing file or police record, those asserted threats of injuries are entirely hypothetical. There is no evidence that Peet is planning to move from his current home, so to the extent Peet alleges that potential future landlords might deny his rental application if they get access to his housing file, that threat too is hypothetical and conjectural. Furthermore, the evidence shows that Peet's housing file is unavailable to third parties, including landlords, unless Peet gives written authorization. Chambers Aff. ¶ 10 [ECF No. 110]. Given that Peet therefore has control over which

landlords might see his housing file, he cannot show that any threat of injury due to documents in his housing file is real or immediate.  *See Lyons*, 461 U.S. at 102.  Because none of Peet's alleged injuries confer standing to seek injunctive relief, his § 1982 claim against the City Defendants must be dismissed.

Moreover, Peet's claims against the City Defendants are moot because neither Goettel nor Luna work for the City of Richfield.  *See* Chambers Aff. ¶ 3 (Defendant Luna stopped working for the Richfield Housing and Redevelopment Authority in February 2016); O'Leary Sullivan Decl., Ex. 1 at 221 (Peet acknowledging that Goettel is no longer Mayor of Richfield); *City Council*, CITY OF RICHFIELD, MINNESOTA, https://www.richfieldmn.gov/city-government/city-council, (last visited July 6, 2020) (listing Maria Regan Gonzalez as Mayor); *Debbie Goettel, District 5*, HENNEPIN COUNTY, MINNESOTA, https://www.hennepin.us/your-government/leadership/5th-district (last visited July 6, 2020) (listing Debbie Goettel as a Hennepin County Commissioner).  Because neither Goettel nor Luna "possess any official power, the action against them is, of course, moot."  *Tara Enters., Inc. v. Humble*, 622 F.2d 400, 401 (8th Cir. 1980) (citing *Four Star Publ'ns, Inc. v. Erbe*, 304 F.2d 872, 874 (8th Cir. 1962).

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.      Defendants Sue Morfitt and Mark Jones's Motion for Summary Judgment [ECF No. 185] is **GRANTED**;

2.      Defendants Debbie Goettel and Michelle Luna's Motion for Summary Judgment [ECF No. 177] is **GRANTED**;

3.      Plaintiff John Peet's Amended Complaint [ECF No. 23] is **DISMISSED;**

      A.      Peet's § 1982 claim against Defendants Sue Morfitt and Mark Jones is DISMISSED WITH PREJUDICE;

      B.      Peet's § 1982 claim against Defendants Debbie Goettel and Michelle Luna is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  July 9, 2020                             s/ Eric C. Tostrud
                                                Eric C. Tostrud
                                                United States District Court